UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **JASON KELLY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )  **Civil Action No. CV-05-S-1072-NE** |
| | ) |
| **GLEN NUNLEY,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Jason Kelly, brought suit under 42 U.S.C. § 1983, alleging false arrest and malicious prosecution against defendant, Glen Nunley, an investigator for the Huntsville Police Department. The action now is before the court on defendant's motion for summary judgment (doc. no. 41).

When summary judgment motions are filed, the pertinent part of Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[1]

---

[1] Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## PART ONE

*Summary of Relevant Facts*

A sixteen year-old juvenile female identified by the initials "C. P.", was abducted by a black male in a dark or black Cutlass Ciera on May 30, 2003.[2] C.P. was driven to an abandoned house where the black male forced her to the ground and tried to remove her pants.[3] As C.P. attempted to flee, he hit her on the back of the head, knocking her unconscious.[4] C.P. awoke in the house wearing only a shirt. She

---

[2]*See* doc. no. 49 at 1 (brief in support of summary judgment). At least one witness relayed that C.P. accepted a ride with her attacker and had been using drugs. *See* doc. no. 55 at 1; Evidentiary Submission Vol. 3; doc. no. 47, ,Exh. CC; doc. no. 48, Exh. HH.

[3]*See* doc. no. 49 at 2.

[4]*See id*.

had a bump on her head, scratches on her arms, and soreness in her thighs.[5] After finding her clothing on a nearby couch, C.P. dressed and began walking away from the house.[6] While walking, C.P. encountered two men, later identified as Herschel "Ronnie" Baker and Jeff Goggins, and asked them for directions to Five Points.[7] The men offered C.P. a ride, but she declined.[8] As C.P. continued walking, a friend driving in the vicinity saw C.P. and took her home.[9]

The next day, C.P. called the Huntsville Police Department to report the kidnaping and rape.[10] Officers Chad Morgan and Mark Hale responded to the call.[11] During an interview with Officer Morgan, C.P. had trouble giving an exact height and weight description of the attacker. Ultimately, in response to Officer Morgan's inquiries, she replied, "He's about your size."[12] As a result, Officer Morgan wrote his own height (6'5") and weight (280 lbs.) on the incident report with an "@" symbol in front of the height and weight blocks on the form to indicate that C.P.'s description of the attacker was simply an approximation.[13] During the same interview, C.P.

---

[5]*See id.*
[6]*See* doc. no. 49 at 2.
[7]*See id*.
[8]*See id*.
[9]*See id*.
[10]*See id*. at 3.
[11]*See id*.
[12]*Id*.
[13]*Id*.

identified the vehicle in which she was kidnaped as a black Cutlass Ciera.[14]

Later that day, C.P. was examined by a forensic nurse for the Crisis Services of North Alabama ("CSNA").[15] The forensic nurse determined that C.P. had injuries consistent with the history provided by her, including a red and swollen cervix, vaginal abrasions, and a bump on the back of her head.[16] The forensic nurse determined that C.P. had physical injuries consistent with an attack and rape.[17] Notes taken by the forensic nurse indicate that C.P. stated the attacker had scratches on his lower arms.[18] Photographs taken of defendant on the day of his arrest show prominent scars or scratches on his lower arms.[19]

C.P. saw the attacker drive by her house on June 1, 2003, the day after she reported the alleged kidnaping and rape.[20] Driven by another person, C.P. began a search for the automobile the attacker had been driving, which she found in front of a nearby house.[21] C.P. observed beads hanging from the mirror on the car's front windshield.[22] Shortly thereafter, C.P. returned to the house a second time and saw the

---

[14]*See* doc. no. 49 at 3.
[15]*See id.*
[16]*See id.* at 3-4.
[17]*See id.* at 4.
[18]*See id.*
[19]*See id.*
[20]*See id.*
[21]*See id.*
[22]*See id.*

attacker standing outside.[23] C.P. then called the Huntsville Police Department and reported that the attacker was standing outside of 1107-B England Street.[24] The police officers who responded to the call found plaintiff, Jason Kelly, and his wife standing next to an "Oldsmobile Ciera."[25] C.P. confirmed that Kelly was the attacker.[26] Kelly is 5'9 and weighs 225 pounds.[27]

Defendant Nunley was assigned to investigate the case on or about June 3, 2003.[28] He went to see Kelly on June 3, 2003, and a conversation ensued.[29] At that time, Kelly owned two Oldsmobile Delta 88 cars— one of which was dark blue and the other a light blue color.[30] During the conversation, Kelly told Nunley that neither car was operable.[31] Nunley asked Kelley's wife whether she was with Kelly the night of the incident, and she replied, "He is with me all the time."[32]

Nunley interviewed C.P. on June 4, 2003, who described the kidnaping, rape, and events occurring afterwards.[33] Nunley asked C.P. to provide a written statement

---

[23] *See* doc. no. 49 at 4.
[24] *See id.* at 5.
[25] *Id*. (citing Ex. X, Hendricks Rep., dated 6-1-03).
[26] *See id*. at 5.
[27] *See id*.
[28] *See id*.
[29] *See id*.
[30] *See id*.
[31] *See id*. at 6.
[32] *Id*.
[33] *See id*.

describing the events, and she complied.[34] That same day, while C.P. was present at his office, Nunley discussed the case with Assistant District Attorney Patricia Demos ("ADA Demos").[35] According to ADA Demos, Nunley told her the following in summarizing the case: (1) C.P. identified Kelly as the attacker; (2) Kelly claimed that his automobiles were not operable; and (3) Kelly's wife stated that Kelly was with her all the time.[36] ADA Demos advised Nunley that she believed there was probable cause for Kelly's arrest.[37] After conferring with ADA Demos, Nunley drafted the charge sheets and escorted C.P. to a warrant magistrate.[38]

Magistrate Jayne Melton received C.P.'s affidavits and listened to live sworn testimony from C.P. concerning the incident.[39] Magistrate Melton does not consider a police officer's written charge sheets or unsworn statements to determine probable cause.[40] Magistrate Melton did not obtain any testimony from Nunley, nor did Nunley attempt to persuade or influence her decision to issue arrest warrants for Kelly.[41] Instead, based on C.P.'s testimony alone, Magistrate Melton found probable

---

[34]*See id*.
[35]*See* doc. no. 49 at 7.
[36]*See id*.
[37]*See id*.
[38]*See id*.
[39]*See id*.
[40]*See id*. at 8.
[41]*See* doc. no. 49 at 8.

6

cause to arrest Kelly on charges of kidnaping and rape.[42] Magistrate Melton issued two warrants for Kelly's arrest which were signed by C.P. as the affiant.[43] Kelly was arrested later that day, June 4, 2003, pursuant to the warrants.[44]

Also that same day, Nunley asked a dispatcher to send crime scene investigators to photograph the cars at Kelly's home.[45] Investigator Harold Hutchison photographed both vehicles.[46] Investigator Hutchison placed the photographs in the crime scene file and documented his actions in a report dated December 17, 2003.[47] The photographs would have remained in the crime scene file until the assistant district attorney handling the case requested the crime scene file.[48] Although the assistant district attorney handling the case never actually looked at the photographs, she was nonetheless aware that the photographs existed.[49] The photographs show: (1) Kelly's dark blue automobile; (2) Kelly's light blue automobile; (3) debris on the dark blue car; (4) debris on the light blue car; (5) beads hanging in the light blue vehicle; (6) wires hanging out of the dark blue car's dashboard; and (7) a flat tire on

---

[42]*See id.*
[43]*See id.*
[44]*See id.*
[45]*See id.* at 9.
[46]*See id.*
[47]*See id.*
[48]*See id.*
[49]*See id.*

the dark blue car.[50]

Nunley interviewed Hershell "Ronnie" Baker and Jeff Goggins on June 5, 2003, who recalled seeing C.P. on the night of the incident.[51] Baker and Goggins provided handwritten statements.[52] That same day Nunley and Hutchison went to the abandoned house where C.P. was raped and collected evidence, including a 2 x 4 board and eight used condoms lying on the floor.[53] Also that day, Hutchison submitted a DNA sample from Kelly and various swabs taken from C.P. during the CSNA examination to the Alabama Department of Forensic Sciences.[54] Hutchison did not submit the eight used condoms at that time because he wanted to first ascertain the significance, if any, of the forensic evaluation of Kelly's DNA sample and the swabs taken from C.P.[55] The Alabama Department of Forensic Sciences reported on November 3, 2004, that there was no spermatozoa found on the various swabs taken from C.P.; thus neither the DNA sample from Kelly or the condoms were examined.[56]

Nunley was called to testify at Kelly's preliminary hearing at the Madison

---

[50] *See* doc. no. 49 at 10.
[51] *See id.*
[52] *See id.* at 11.
[53] *See id.*
[54] *See id.*
[55] *See id.*
[56] *See id.* at 11-12.

County District Court on July 29, 2003.[57] Nunley recounted C.P.'s kidnaping and rape allegations to the judge, as well as his conversation with Kelly and Kelly's wife, including Mrs. Kelly's statement that she was with Kelly the night of the incident.[58] Nunley also testified that Kelly claimed the car allegedly used to abduct C.P. was not operable, and confirmed that the car had a flat tire.[59]

Because the Madison County District Court found probable cause, the case against Kelly was bound over to the grand jury.[60] The Madison County Grand Jury indicted Kelly for rape in the first degree, kidnaping in the first degree, and rape of an incapacitated person in the first degree on December 4, 2003.[61] In December 2003, ADA Demos left the district attorney's office, and the Kelly case was reassigned to Assistant District Attorney Allison Palmer.[62] Both ADA Demos and ADA Palmer believed that the victim's identification of Kelly as the attacker, coupled with the physical injuries suffered by C.P., provided more than sufficient probable cause to prosecute Kelly.[63]

At the time of Kelly's prosecution, the decision to prosecute a case was made

---

[57] *See* doc. no. 49 at 12.
[58] *See id*
[59] *See id*.
[60] *See id*.
[61] *See id*. at 12-13.
[62] *See id*. at 13.
[63] *See id*.

solely by the assistant district attorney to whom the case was assigned, subject to review by the district attorney.[64]  No police officers, including Nunley, had authority to decide whether to prosecute Kelly.[65]  At no time did Nunley pressure ADA Demos or ADA Palmer to prosecute.[66]  ADA Palmer ultimately decided to file a motion to *nolle prosequi* the kidnaping and rape charges against Kelly because she felt it was not in the best interests of C.P. to take the case to trial.[67]  The circuit court granted ADA Palmer's motion on December 1, 2004, in an order that states "(1) the State cannot proceed at this time with the case" and "(2) the Defendant is to have no contact with the victim or the victim's family."[68]  If Kelly had violated the express condition of the order by contacting C.P. or C.P.'s family, ADA Palmer would have reinstated the charges against him.[69]

## PART TWO

*Discussion of Plaintiff's Claims*

Defendant Glen Nunley has asserted the affirmative defense of qualified immunity as an alternative ground for summary judgment.  When assessing such a

---

[64]*See* doc. no. 49 at 13-14.
[65]*See id*. at 14.
[66]*See id*.
[67]*See id*.
[68]*Id*.
[69]*See id*. at 14-15.

defense, the district court must "answer the legal question of whether the defendant [is] entitled to qualified immunity under [*the plaintiff's*] version of the facts." *Thornton v. City of Macon*, 132 F.3d 1395, 1397 (11th Cir. 1998) (citing *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 & n.3 (11th Cir. 1996)).

> Indeed, we approach the facts from the plaintiff's perspective because "[t]he issues . . . concern 'not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law.'" *Sheth* [*v. Webster*], 145 F.3d [1231,] 1236 [(11th Cir. 1998)] (quoting *Johnson v. Jones*, 515 U.S. 304, 311, 115 S. Ct. 2151, 2155, 132 L. Ed. 2d 238 (1995)). As this Court has repeatedly stressed, the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000). Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff. *See Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002).

*Lee v. Farraro*, 284 F.3d 1188, 1190 (11th Cir. 2002); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider . . . this threshold question: *Taken in the light most favorable to the party asserting the injury*, do the facts alleged show the officers' conduct violated a constitutional right?") (emphasis supplied).

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"

*Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (citing *Saucier v, Katz*, 533 US. at 201). If no constitutional right is violated, the inquiry ends regarding qualified immunity. *Saucier*, 533 U.S. at 201. If a constitutional right would have been violated under plaintiff's version of the events, the next step is to ask whether the right was "clearly established." *Vinyard*, 311 F.3d at 1346.

The gravamen of plaintiff's complaint is the assertion that defendant Nunley failed to inform either the magistrate who issued the arrest warrant, or the assistant district attorney who continued to prosecute plaintiff, that the dark blue car in plaintiff's yard was not operable and, therefore, could not have been used in kidnaping the victim.

**A.     False Arrest**

An arrest does not violate the Fourth Amendment if it is based on probable cause. *See Wood*, 323 F.3d at 878. Probable cause to effect an arrest exists if, at the moment the arrest was made, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the person arrested either had committed,

or was committing, an offense. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

To receive qualified immunity, "an officer need not have actual probable cause but only 'arguable probable cause.'" *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997). Stated somewhat differently, the inquiry is "not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Id.*

The court easily concludes that defendant had probable cause to arrest plaintiff. The sixteen-year-old victim identified plaintiff as her assailant, and her physical injuries were consistent with one who had been raped. During his investigation, defendant received conflicting information about the operability of plaintiff's car.[70] The victim, not defendant, testified under oath before the magistrate that plaintiff kidnaped and raped her; and, based on the victim's testimony alone, Magistrate

---

[70]*See* doc. no. 45, Exh. I (Minor Depo. at 81):

Q. I assume you also told him that you had seen the dark blue vehicle absent from its parking space as recently as a day or two before the detective came by Mr. Kelly's house.

A. I told him that I'd seen the cars driven. And he asked me specifically about that blue car after I had pinpointed it in the picture. He said, Have you seen that car driven, and I said, Yes. And he asked me how many times like you did, and I told him I couldn't really tell him how many. And I basically told him the same thing I just told you, about once or twice in the daytime and other times were at night.

*See also* doc. no. 46, Exh. Q (sworn statement of Greg Minor).

Melton found probable cause to arrest Kelly on charges of kidnaping and rape.[71] Under these circumstances, probable cause existed to arrest Kelly. Defendant is entitled to qualified immunity on the false arrest claim.

**B.     Malicious Prosecution**

A plaintiff must prove the following elements to establish a malicious prosecution claim under § 1983: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). Under Alabama law, the elements of a malicious prosecution claim are: (1) a criminal prosecution instituted and continued by the defendant; (2) with malice and without probable cause; (3) that was terminated in the plaintiff's favor; and (3) and caused damages to the plaintiff. *Id*. at 882 (citing *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831-32 (Ala. 1999)).

As outlined above, probable cause existed to arrest plaintiff. Probable cause bars any malicious prosecution claim. *See Wood*, 323 F.3d at 882. The basis for plaintiff's complaint is undercut by the fact that defendant testified during the preliminary hearing and relayed his conversation with plaintiff and plaintiff's wife,

---

[71]*See* doc. no. 49 at 8, admitted at doc. no. 55 at 4; *see also* doc. no. 45, Exh. H at 12-15 (Melton Depo.).

including her statement that she was with him the night of the incident.[72] Defendant also testified that plaintiff claimed the automobile allegedly used to abduct C.P. was not driveable, and confirmed that the car had a flat tire.[73]  Therefore, evidence that may have indicated Kelly's innocence was revealed by defendant and considered by the court.  Nonetheless, the Madison County District Court judge found probable cause to exist, and bound the case over to the grand jury, which subsequently indicted Kelly for rape in the first degree, kidnaping in the first degree, and rape of an incapacitated person in the first degree.[74]  Because plaintiff cannot show a Fourth Amendment violation, defendant is entitled to qualified immunity on the malicious prosecution claim under § 1983.

## PART THREE

*Conclusions and Orders*

In light of the foregoing, defendant's motion for summary judgment is GRANTED, and plaintiff's claims are dismissed with prejudice.  Costs are taxed to plaintiff, and the clerk is directed to close this file.

DONE this 12th day of September, 2007.

_____
United States District Judge

---

[72] *See* doc. no. 49 at 12.
[73] *See id*.
[74] *See id*. at 12-13.